J-S21032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: E.D.V.C., A MINOR | : IN THE SUPERIOR COURT OF<br>:      PENNSYLVANIA<br>:<br>: |
| APPEAL OF: A.V.C., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>: No. 314 MDA 2026 |

Appeal from the Decree Entered January 22, 2026
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0084a

| | |
|---|---|
| IN RE: L.E.C., A MINOR | : IN THE SUPERIOR COURT OF<br>:      PENNSYLVANIA<br>:<br>: |
| APPEAL OF: A.V.C., MOTHER | :<br>:<br>:<br>:<br>:<br>: No. 315 MDA 2026 |

Appeal from the Decree Entered January 22, 2026
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0083a

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:　　　**FILED: AUGUST 3, 2026**

A.V.C. (Mother) appeals from the decrees entered by the York County Court of Common Pleas, which terminated her parental rights to her now eight-year-old son, E.D.C., and her now seven-year-old daughter, L.E.C.

(collectively, the Children), pursuant to the Adoption Act.[1]  ***See*** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  After review, we affirm.

Relevantly, Mother previously appealed from the orders changing the Children's permanency goals from reunification to adoption.  This Court affirmed the orphans' court's orders.  We incorporate the following factual and procedural history from this Court's prior memorandum.

> This family has a history of involvement with the York County Office of Children, Youth and Families ([the Agency]) dating back to 2018 regarding, *inter alia*, housing concerns. ***See*** Orders of Adjudication and Disposition, 4/16/24, at 1. On February 24, 2024, the Agency received a report alleging that then-six-year-old E.D.C. was locked in a makeshift cage for extended periods of time in maternal grandmother's home, where Mother resided with the Children.[FN 2] ***See id.*** The report also alleged that then-five-year-old L.E.C. was regularly left strapped in a car seat in the home that was too small for her size. ***See id.*** Finally, the report alleged that Mother neglected the Children's medical care. ***See id.***
>
> > FN 2 Mother consistently resided with maternal grandmother throughout these dependency proceedings.
>
> On the day the report was received, the Agency sent a caseworker to the family home. ***See id.*** at 1-2. Mother was not there, but the Agency spoke with maternal grandmother, who reported that she was acting as the full-time caregiver for the Children because Mother was not consistently present to parent them. ***See id.*** at 2. At this visit on February 24, 2024, and three subsequent unannounced visits over the following week, the Agency observed E.D.C. locked in the makeshift cage, which consisted of two cribs stacked on top of each other, and

---

[1] J.R. (Father) consented to the involuntary termination of his parental rights and the adoption of the Children.  The orphans' court accepted Father's consent and terminated his parental rights.  Father did not appeal.

L.E.C. restrained in the small car seat. *See id.* Although the Agency explained the inappropriateness of these restraints to Mother and maternal grandmother, neither of them stopped using them. *See id.*

During the Agency's investigation, Mother admitted that the Children had not been seen by a doctor or dentist in at least four years. *See id.* The Agency arranged for the Children to be seen by a dentist, which revealed that L.E.C. required "full extraction of all [] her top teeth due to extensive decay[.]" *Id.*

On March 19, 2024, upon medical advice, the Agency took the Children to the emergency room.[2] *See id.* at 3. After examination, the Children were admitted to the hospital for malnutrition. *See id.* E.D.C. also had extensive bruising all over his body and "erythema to his penis and scrotum[.]" *Id.* at 3. The hospital expressed concern that the Children, then ages six and five, respectively, were not toilet trained and wore diapers. *See id.*

On March 20, 2024, the Children were placed in the emergency protective custody of the Agency. Following a shelter care hearing two days later, the court confirmed the Children's separate placements in foster care.

The court adjudicated the Children dependent on April 16, 2024, and maintained their foster care placements. The court established the Children's permanency goals as reunification with concurrent goals of adoption. In the order, the court found that Mother and maternal grandmother committed child abuse against the Children pursuant to 23 Pa.C.S.A. § 6303, specifically that they "knowingly and recklessly caused the unreasonable restraint of [the Children] and caused serious physical neglect" of the Children with respect to their medical needs. Orders of Adjudication and Disposition, 4/16/24, at 4, 7.

_____

[2] The Agency also took another child, the Children's older half-sister, who was living in the home to the emergency room. After being evaluated, this child was discharged to her father's custody. She is not a party to this appeal.

In furtherance of reunification, Mother was ordered to, *inter alia*, complete a threat of harm assessment along with any resulting recommendations and parenting classes. Notably, on April 16, 2024, the juvenile court did not grant Mother visitation due to a finding that it would pose a "grave" threat to the Children. **Id.** at 7. The court later clarified that contact of any kind between Mother and the Children was prohibited. **See** Permanency Review Orders, 7/2/24, at 4-5. Mother did not appeal from any of these orders. The prohibition on contact and visitation between Mother and the Children has remained in place throughout these proceedings.

On May 17, 2024, the Agency filed motions requesting the court to issue findings that aggravated circumstances exist with respect to Mother. The juvenile court held a hearing on June 10, 2024, and granted the motions. In addition, the court ruled that reasonable efforts to preserve and reunify the family shall not continue. **See** Aggravated Circumstances Orders, 6/[11]/24, at 1-2. ("Reasonable Efforts to Reunify: No efforts are to be made to preserve the family and reunify the Child[ren] with [] Mother."). Again, Mother did not appeal from these orders.

In the aggravated circumstances orders, the court found that Mother's physical abuse and neglect of the Children caused them to have "significant lower body muscle deficits," developmental delays to their speech and social skills, and "seriously impaired" functioning. Aggravated Circumstances Orders, 6/[11]/24, at 1. The Children required physical therapy to address their delayed "gross motor" development. Orders of Adjudication and Disposition, 4/16/24, at 5. Specifically, E.D.C. suffered from "lower extremity weakness" and "impaired balance," which affected his ability to walk. Order of Adjudication and Disposition (E.D.C.), 4/16/24, at 5. L.E.C. needed a "medical stroller to address her extremely limited mobility and gait for her age." Order of Adjudication and Disposition (L.E.C.), 4/16/24, at 5.

The juvenile court held permanency review hearings on July 2, 2024, January 14, 2025, and July 7, 2025.[FN 4] Each of the permanency review orders from these hearings stated that "[i]t has been determined that visitation with [] Mother

- 4 -

is contrary to the safety or well-being" of the Children. Permanency Review Orders, 7/2/24, at 4-5; Permanency Review Orders, 1/14/[25], at 4; Permanency Review Orders, 7/7/25, at 4.

> FN 4 The court also held status review hearings on October 8, 2024, November 19, 2024, and April 15, 2025.

Despite the court's directive that the Agency make no reasonable efforts toward reunification, it provided Mother with services through Catholic Charities. The permanency review orders up through and including January of 2025, revealed that Mother's compliance and progress with her objectives was minimal. On July 7, 2025, Mother's compliance and progress were rated as moderate for the first time. Mother completed the threat of harm assessment, which recommended continued support from the Agency. In addition, the certified record reflects that Mother had been attending the assessment's recommended dialectical behavior therapy ("DBT") for three months. She was also attending a parenting program, but there was no evidence that she completed it.

The juvenile court held [a] permanency review hearing on July 7, 2025, by which time the Children had been in placement for fifteen months. [. . . .]

At the conclusion of the hearing, the juvenile court *sua sponte* ruled on the record and in open court that the Children's permanency goals [would] be changed from reunification to adoption. ***See*** N.T., 7/7/25, at 98. On July 7, 2025, the court entered the [] orders, which included a provision continuing the suspension of visitation and contact of any kind between Mother and the Children. ***See*** Permanency Review Orders, 7/7/25, at 4. The court also found that the Agency did not have a documented compelling reason for not proceeding with petitions for the involuntary termination of Mother's parental rights. ***See id.*** at 3-4.

***Interest of E.C.***, 356 A.3d 847, *1-*3 (Pa. Super. 2026) (non-precedential

decision) (some footnotes omitted; naming conventions altered).

- 5 -

As noted, Mother appealed the goal change, and this Court affirmed. *Id.* at *6-*7. This Court determined that the record was "clear that the Children's best interests" were served by a goal change to adoption. *Id.* at *5, *6.

On September 5, 2025, the Agency petitioned to involuntarily terminate Mother's parental rights. The juvenile court held another status review hearing on September 30, 2025 and a permanency review hearing on December 9, 2025. At the December 9 permanency review hearing, Mother was found to be minimally compliant with the permanency plan and to have made minimal progress. The court also explained that Mother was reevaluated and her risk of harm to the Children remained high. *See* Permanency Review Orders, 12/10/25, at 2; Orphans' Court Opinion (O.C.O.), 3/18/26, at 5.

On January 21, 2026, the orphans' court held a termination hearing. At the hearing, each child was represented by separate legal counsel, and the Children were also represented by their guardian *ad litem* (GAL). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020); *see also* 23 Pa.C.S.A. § 2313(a). At the end of the hearing, the court terminated Mother's parental rights to the Children.[3]

---

[3] The briefs in this case from the Agency (joined by Father's counsel and E.D.C.'s legal counsel), the Children's guardian *ad litem*, and L.E.C.'s legal counsel indicate that sometime after the termination hearing, Mother was arrested and criminally charged for her treatment of the Children.

- 6 -

Mother timely filed this appeal. She raises the following two issues for our review:

I. Whether the orphans' court erred in terminating the parental rights of Mother pursuant to Sections 2511(a)(1), (2), (5), and (8) of the Adoption Act?

    a. The evidence did not support by clear and convincing evidence that Mother had evidenced a settled purpose of relinquishing her parental claim to the Children or has refused or failed to perform parental duties.

    b. The evidence did not support by clear and convincing evidence that the Children were without parental care or control or that the conditions which led to the initial placement would not or could not be remedied by Mother.

    c. There was not clear and convincing evidence that Mother could not or would not remedy the conditions which led to the initial removal.

    d. There was not clear and convincing evidence that the conditions which led to the removal or placement of the Children continued to exist and termination of parental rights would best serve the needs and welfare of the Children.

II. Whether the orphans' court erred in concluding that termination of parental rights would best serve the needs and welfare of the Children pursuant to Section 2511(b) of the Adoption Act?

Mother's Brief at 6 (cleaned up and excess capitalization omitted) (orphans' court's and suggested answers omitted).

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are

- 7 -

supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267. Furthermore, the "trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in

the evidence." **In re M.G.**, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting **Matter of Adoption of Charles E.D.M., II**, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

**In re C.M.K.**, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted); **see also Interest of M.E.**, 283 A.3d 820, 830 (Pa. Super. 2022).

Instantly, the orphans' court terminated Mother's rights under Section 2511(a)(1), (2), (5), (8), and (b).[4] As we may affirm under any ground under

---

[4] We note that the Agency's termination petitions listed Section 2511(a)(1), (2), (5), and (8) as the grounds alleged for termination, but did not specifically list (b). **See** Petitions for Involuntary Termination of Parental Rights, 9/5/25, at ¶ 15. Nevertheless, the petitions discussed the Children's best interests under (a)(8) and noted, at the end of the petitions, that the Agency believed
*(Footnote Continued Next Page)*

Section 2511(a), we review the court's decision as to Section 2511(a)(2).

That subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [. . .]
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).

---

the petitions best served the Children's needs and welfare. The final decrees terminated Mother's parental rights but were silent as to which specific subsections the orphans' court was terminating under. At the end of the termination hearing, the court mentioned Section 2511(a)(1), (2), (5), and (8), but did not specifically mention (b). **See** N.T., 1/21/26, at 104-115. Nevertheless, the court explained to us in its opinion that it considered the Children's best interests, and its best interest analysis was interwoven with its discussion of the subsection (a) factors. O.C.O. at 12-13. Moreover, Mother and all other parties to the case clearly understood that the court was terminating under Section 2511(a) and (b), and Mother raised no issue with the Agency's petition or the court's procedure.

Moreover, grounds for termination under Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citation omitted). On this point, we emphasize that parents "are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*. (citation omitted).

Here, the orphans' court determined that the Agency had proven the statutory grounds for termination under Section 2511(a)(2). At the end of the hearing, the court explained that Mother had an inability to parent the Children due to her cognitive and mental health shortcomings. *See* N.T., 1/21/26, at 108. It was unlikely that she would ever be able to meet the needs of the Children who were highly demanding and highly needy. *Id.* The court noted that the Children were highly needy because of Mother's own acts of neglect. *See id.* Moreover, the court explained that it did not believe that Mother had protective capacity. *Id.* Mother lacked accountability and did not acknowledge that her actions had been "grossly inadequate and improper and neglectful." *See id.* at 109. The court reiterated that there was "severe abuse and significant neglect" in this case, as evidenced by the Children's malnourishment and L.E.C.'s teeth decay. *See id.* The court explained that Mother had "interventions, but even after all the interventions" the court's "concerns about protective capacity" remained because Mother still failed to acknowledge her role in the case. *See id.* at 111.

On appeal, Mother argues that the testimony provided at the hearing did not establish that there was a repeated and continued incapacity, abuse,

neglect, or refusal of the parent causing the child to be without parental care. Mother's Brief at 16. Mother asserts that the fundamental reason for the Children's removal had been remedied. *Id.* Mother claims that she worked during the almost two years after the Children's removal to learn and remedy the situation that led to their removal. *Id.* at 17. Mother also alleges that the Agency's caseworker's testimony that Mother was not entirely able to remedy the conditions that led to removal, insinuated that Mother was able to remedy some of the conditions. *Id.*

Mother's argument is belied by the record and fails to appreciate the standard of review we must apply in termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M., supra*.

Here, the record supports the orphans' court's findings. In the almost two years between the Children's removal and the termination hearing, Mother did not or could not remediate the incapacity, abuse, neglect, or refusal that caused the Children to be without essential parental care, control, or subsistence. Although Mother claims in her brief that the "fundamental reason" for the Children's removal had been remedied, she fails to explain what fundamental reason she is referring to.

At the termination hearing, Mother still maintained that she never abused or starved the Children. N.T., 1/21/26, at 50. This was after the Children were removed from her care, the juvenile court found that she abused the Children, the court found that aggravated circumstances existed

against her for that abuse, medical professionals expressed concerns about the Children's malnourishment and development, and Mother was found to be a high risk of harm to the Children. Yet, Mother still claimed that she kept E.D.C. in a "handmade security crib" to keep him safe because he would roam at night, and L.E.C. liked sleeping in her "height chair" because she did not want to sleep in the room with her older sister and wanted to sleep in the living room closer to her grandmother. *Id.* Thus, the orphans' court was well within its discretion to determine that Mother still lacked protective capacity, given her refusal to acknowledge that she previously abused and neglected the Children.

Moreover, as of the termination hearing, Mother was still living with maternal grandmother, in the house where the Children were previously abused and neglected. Mother testified that a month prior to the termination hearing, over one and a half years after the Children were removed, she applied for Section 8 housing. *See id.* at 58. However, she did not know how long the wait list was for that housing. *Id.*

Mother also testified that she completed the required drug and alcohol classes for a previous driving under the influence offense a week before the termination hearing, although she thought she had been sentenced for the offense three years prior. *Id.* at 53-54, 59-60. The Agency caseworker and the person responsible for drug testing Mother noted that Mother's compliance with the testing was inconsistent. *See id.* at 18-19, 41. Mother stated that

her therapist suggested that she participate in trauma therapy, but she had not started that at the time of the termination hearing. *Id.* at 54-55.

Thus, the record supports the orphans' court's decision. Mother's repeated and continued incapacity, abuse, neglect, or refusal caused the Children to be without essential parental care, control, or subsistence. We acknowledge that there was evidence of Mother's compliance with certain services. However, we emphasize the distinction between compliance and progress; even when Mother was compliant, she did not make enough progress such that the Children could be reunified with her. *See* Administrative Office of Pennsylvania Courts Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook* 14-8 (4th ed. 2024) ("While the parents' refusal or failure to comply is relevant, the real issue is progress. It is not unusual for parents to be compliant and cooperative but make no progress."). The evidence supported that Mother was unable to remedy the conditions which led to the Children's placement, given that she was still a high risk of harm to the Children, and she failed to take accountability for her actions. We discern no error of law or abuse of discretion in the court's decision under Section 2511(a)(2).

We turn next to Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

>inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); *see also C.M.K.*, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child (citation omitted)).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" *K.T.*, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." *Id.* at 1106 (citing *T.S.M.*, 71 A.3d at 267). Our Supreme Court also requires courts to consider, not only whether the children have a bond with their biological parent, but also whether the children are in a pre-adoptive foster home and whether they have a bond with their foster parents. *Id.* (citing *T.S.M.*, 71 A.3d at 268; *In re D.C.D.*, 105 A.3d 662, 677 (Pa. 2014)).

Here, the orphans' court concluded that terminating Mother's parental rights was in the Children's best interest. The court explained that the Children were safe and thriving, and their current placement was pre-adoptive. ***See*** O.C.O. at 12. The Children had stability with the foster family, which the court found was in their best interest. ***See id.*** The court also noted at the termination hearing that the Children's best interests were served by terminating parental rights and moving toward permanency and adoption. N.T., 1/21/26, at 114. The Children were in a pre-adoptive home, where they were safe, flourishing, and had stability. ***Id.*** The Children had a bond with the foster parents and identified them as "mom" and "dad." ***Id.*** at 115. They were also placed together and had a sibling bond with each other. ***Id.***

On appeal, Mother argues that the testimony was insufficient to show there was a lack of bond between Mother and the Children. Mother's Brief at 22. Mother asserts that there "really was never much of an analysis or emphasis on the bond between her and the" Children while the dependency matter was pending. ***Id.*** at 22-23. Mother notes that she raised this issue, *i.e.* that she had continuously been precluded from having contact with the Children, in her appeal of the goal change. ***Id.*** at 23. Mother asserts that the orphans' court's sole focus on this issue seemed to be that the Children had been removed for two years without any contact with Mother. ***See id.*** (footnote omitted).

To begin, we remind Mother that this Court already addressed the Children's goal changes and the prohibition on Mother's contact with the Children in her prior appeal of the goal change. **See Interest of E.C., supra**. This Court affirmed the juvenile court's decision, emphasizing that "when the court found aggravated circumstances existed as to Mother, it expressly provided that" the Agency "not make reasonable efforts to reunify the Children with her." **Id.** at *5 (citation omitted). As this Court noted, the "record does not reveal why" the Agency "graciously continued to provide reunification services to Mother, nor why the court allowed such services to continue after its order for no reasonable efforts to be made." **Id.** at *5 n.6. This Court disagreed that the juvenile court's suspension of Mother's visitation was unjustified "inasmuch as Mother continued to demonstrate a lack of accountability for the Children's placements." **Id.** at *5 (citation omitted). Moreover, Mother continued to reside with maternal grandmother. **Id.**

As discussed **supra**, these issues persisted as of the termination hearing—Mother still had not taken accountability for the Children's removal, and she had only just recently applied for other housing. Thus, not only did this Court already evaluate and decide the issue regarding visitation, but the rationale underlying this Court's previous decision is still relevant based on the facts as they were at the time of the termination hearing. **See In re R.P.**, 956 A.2d 449, 452 n.3 (Pa. Super. 2008) ("Since this Court 'has considered and decided a question submitted to it upon appeal, it will not, upon a

- 17 -

subsequent appeal on another phase of the same case, reverse its previous ruling....'" (citation omitted)).

Moreover, as of the termination hearing, Mother had not seen the Children in twenty-two months, due to her own actions which traumatized the Children. *See* O.C.O. at 8-9; *In re Adoption of C.P.D.*, 324 A.3d 11, 27 (Pa. Super. 2024) ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." citation omitted)). The Children's foster mother testified that the Children never asked about Mother. N.T., 1/21/26, at 25; *see also id.* The Agency caseworker testified that the risk of harm to the Children posed by arbitrarily reintroducing contact with Mother was too high. *See* N.T., 1/21/26, at 46. Mother's updated risk of harm evaluation, completed in November 2025, indicated that Mother's risk of harm to the Children remained high for many reasons. *See* Agency's Exhibit 2 at 6; N.T., 1/21/26, at 40-41. Thus, although Mother's lack of contact with the Children was court ordered, Mother fails to acknowledge that it was her own actions in abusing and neglecting the Children that led to them being removed and unable to have contact with her due to their significant trauma.[5] *See* O.C.O. at 8.

_____

[5] Although the orphans' court did not use the word "bond" when discussing the relationship between Mother and the Children, it is clear from the record and the court's opinion that it considered the Children's relationship, or lack
*(Footnote Continued Next Page)*

As for the foster parents, they are pre-adoptive, and the Children refer to them as "mom" and "dad" or "mommy" and "daddy." N.T., 1/21/26, at 25. The foster mother testified that the Children do well in the home, enjoy being together, and are happy. *Id.* at 23.

Thus, the record supports the orphans' court's findings. Mother's challenge to Section 2511(b) merits no relief.

In sum, we discern no error of law or abuse of discretion in the orphans' court's decision to terminate Mother's parental rights under Section 2511(a)(2) and (b) of the Adoption Act.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/3/2026

---

thereof, with Mother. *See K.T.*, 296 A.3d at 1114 ("We do not prescribe 'magic words' for the trial court's recital.").